# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **RALPH WARD,** | ) |
| *Plaintiff*, | ) |
| | ) Civil Action No: 3:20-cv-981 |
| v. | ) Judge Richardson |
| **KEVIN REYNOLDS,** | ) Magistrate Holmes |
| Et al., | ) JURY DEMAND |
| *Defendants.* | ) |

## FIRST AMENDED COMPLAINT

1. Plaintiff **RALPH WARD** brings this 42 U.S.C. § 1983 civil rights claim for damages against Defendants **KEVIN REYNOLDS, TERRANCE STUCKEY**, and **METROPOLITAN GOVERNMENT OF NASHVILLE, DAVIDSON COUNTY** alleging violations of Plaintiff's rights under the Fourth Amendment to the U.S. Constitution.

## PARTIES

2. Plaintiff **Ralph Ward** is a resident of Harris County, Texas.

3. Defendant **Kevin Reynolds** is an adult resident of Dickson County, Tennessee who is, or was at all times relevant to this lawsuit, a Metro Nashville Police Officer.

4. Defendant **Terrance Stuckey** is an adult resident of Rutherford County, Tennessee who is, or was at all times relevant to this lawsuit, a Metro Nashville Police Officer.

5. Defendant **Metropolitan Government of Nashville, Davidson County Tennessee** is a municipal government organized under the laws of the state of Tennessee.

1

## JURISDICTION AND VENUE

6. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because all claims related to this case occurred in this district.

## FACTUAL BACKGROUND

### A. Mr. Ralph Ward

7. The events relevant to this lawsuit began on November 14, 2019. At that time Plaintiff Ralph Ward was a forty-year-old African-American man who worked for T-Mobile as a salaried Sales Manager.

8. In addition to his T-Mobile position, Mr. Ward also worked extra hours as an Amazon delivery driver to earn extra income.

9. As of November 14, 2019, Mr. Ward resided in Nashville, Tennessee.

10. In order to be able to verify his Amazon deliveries, Mr. Ward used his smartphone to track his routes. Mr. Ward's phone tracks the routes using GPS, and keeps a record showing the date and time that the routes were driven.

11. To ensure that he will have a reliable record, Mr. Ward also separately tracks his delivery routes with a GPS unit in his car.

12. In November 2019, Mr. Ward's car was a 2013 red hybrid Lexus 300, registered to his address in Nashville, Tennessee with Tennessee License Plate No. 1K65U5.

### B. November 14, 2019

13. On November 14, 2019, Mr. Ward drove out to Baxter, Tennessee and spent most of the day doing network testing for T-Mobile's new 5G network.

14. In the late afternoon, Mr. Ward returned to Nashville to do his Amazon delivery route.

15. Mr. Ward drove to the Amazon Station on Brick Church Pike in Nashville, Tennessee to pick up packages for his evening delivery route. Mr. Ward arrived at the Amazon Station at approximately 5:00 PM.
16. The delivery truck to the Amazon Station was late that evening, and Mr. Ward did not depart the station with his deliveries until 6:17 P.M.
17. Mr. Ward then drove out to Hendersonville and Gallatin to make his Amazon deliveries.
18. At approximately 8:18 P.M., Mr. Ward finished his Amazon deliveries, all of which were in the Hendersonville and Gallatin areas.
19. Mr. Ward headed back toward his home in Nashville, planning to stop by "R&B Liquors" to buy a bottle of vodka before ending his day at home.
20. Mr. Ward took TN Highway 386 to I-65 South, then connected to Briley Parkway going east, then connected to I-24, going east, then exited at Exit 57, Haywood Lane.
21. From the exit, Mr. Ward took a right, headed toward Nolensville Pike. He went through an intersection, then took the next left at Keely Drive.
22. Mr. Ward took Keely to Packard Drive, then made a right on Packard.
23. Mr. Ward then took Packard until it hit Tusculum Road, and turned right on Tusculum.
24. Mr. Ward took Tusculum to Nolensville Pike, then turned left on Nolensville.
25. Mr. Ward remained on Nolensville until he got to R&B Liquors, at 7175 Nolensville Pike, Nolensville, Tennessee.
26. Mr. Ward parked at R&B liquors, turned off his car, and walked into the liquor store.
27. At no point in his journey from the Gallatin/Hendersonville area to R&B Liquors had Mr. Ward traveled on I-65 headed north.

28. At no point in his journey from Gallatin/Hendersonville are to R&B Liquors had Mr. Ward been within the vicinity of Dickerson Pike – rather, Mr. Ward exited I-65 to head east on Briley Parkway before I-65 reached Dickerson Pike.

### C. An MNPD FLEX Team Surveils a Drug Party

29. At 8:33 P.M. on November 14, 2019, a Metropolitan Nashville Police Department ("MNPD") "FLEX" team was conducting surveillance of a suspected "dope party" in a room at a Days Inn.

30. Under then-existing MNPD policy, MNPD FLEX teams were charged with "proactively" ferreting out crime, such as controlled substance offenses.

31. The FLEX team involved maintained steady communications with each other on an MNPD "talk group" radio channel, a channel dedicated exclusively to the team's use.

32. At 8:35 P.M., a black Nissan that the MNPD team had been tracking earlier in the day drove into the Days Inn parking lot and parked. A man got out of the Nissan and walked up to the motel.

33. At 8:39 P.M., two men got into the black Nissan and left the Days Inn.

34. The members of the FLEX team believed that a suspect with outstanding arrest warrants for homicide, Mr. Robert Goodner, was potentially in the Nissan.

35. One of the FLEX team members tracked the Nissan onto I-65 North. The officer activated his car's "blue lights" in an attempt to pull over the target, and then followed it as it exited I-65 North to Briley Parkway East. However, the target was driving too fast and the officer lost it on Briley Parkway East.

36. At 8:45 P.M., other MNPD units operating within the same team, including Defendant Reynolds, misidentified a different car on Briley Parkway, a red Lexus, as the target car.

4

37. The FLEX team discussed the red Lexus over the radio to attempt to confirm whether it was the original target car. The officer who had "blue lighted" the Nissan spoke up and clarified that the original target was a Nissan. However, Defendants and the other FLEX team members disregarded this clarification and treated the red Lexus as if it were the car that had fled the attempted traffic stop.

38. At 8:52 P.M., an unidentified officer with MNPD unit number 6F82 identified the red Lexus as the target while communicating on the North Precinct dispatch channel.

39. The Defendants tailed the red Lexus in their undercover cars, following it all the way to R&B Liquors in Nolensville without ever activating their "blue lights."

40. While Defendants and other MNPD units tailed the red Lexus, MNPD staff asked Nolensville Police Department for help in detaining the Lexus's driver.

### D. The Defendants Arrest Mr. Ward

41. After parking at R & B Liquors, Mr. Ward got out of his car and went into the store.

42. Defendants, who had been tailing Mr. Ward since Briley Parkway, parked their cars in the R & B Liquors parking lot, drew their guns, and ran into the store.

43. As Defendants ran into the liquor store they pointed their guns at Mr. Ward, shouted at him, and ordered him to lay down on the floor with his hands behind his back.

44. Mr. Ward had no idea what was going on and was terrified that he was about to be killed.

45. Mr. Ward quickly laid down on the floor and put his hands behind his back.

46. Notwithstanding Mr. Ward's compliance, the officers handled him roughly, injuring his shoulder while cuffing his hands behind his back.

47. As the Defendants were arresting Mr. Ward, Officer Hays of the Nolensville Police Department arrived at R & B Liquors to provide back up. Officer Hays ran into the store

with his gun drawn and pointed it at Mr. Ward, then put his gun away after seeing that the Defendants had Mr. Ward under control.

48. Moments later, Officer Terns of the Nolensville Police Department arrived at R & B Liquor to provide backup.  He parked his car, ran into the store, and made himself available to help the Defendants take Mr. Ward into custody.

49. Within minutes of Mr. Ward's arrest, two other MNPD patrol officers had parked at R & B Liquors and run into the store to help take him into custody.

50. Mr. Ward was utterly terrified by having so many guns pointed at him and by being arrested for no reason.  He seriously considered the prospect that he might be shot and killed by the police for no reason whatsoever.

51. Mr. Ward respectfully asked the Defendants why they were arresting him.  The Defendants responded by accusing Mr. Ward of having fled a traffic stop.

52. As Defendants took Mr. Ward to the parking lot and placed him in the back of Defendant Reynolds's patrol car, Mr. Ward repeatedly explained that he had not fled a traffic stop.

53. The Defendants told Mr. Ward that they had "lit him up" on I-65 North, to which Mr. Ward responded by explaining that he had not been on I-65 North at all.

54. Mr. Ward explained that he worked for T-Mobile and Amazon, and repeatedly offered to show the Defendants his route on his smart phone and GPS unit in order to prove that he had not been on I-65 North.   However, the Defendants refused to review this evidence.

55. While they were arresting Mr. Ward, the Defendants noted that there had been two men in the original target car whereas Mr. Ward was found alone.  However, the Defendants discounted this discrepancy, speculating without basis that the other man could have run off when Mr. Ward parked at the liquor store.

6

Case 3:20-cv-00981   Document 22   Filed 03/29/21   Page 6 of 13 PageID #: 92

56. Mr. Ward informed the Defendants that he had a firearm in his car, for which he had a lawful carry permit.

57. Defendant Stuckey searched Mr. Ward's Lexus. Inside, Mr. Ward had his T-Mobile backpack and branded Amazon vest laying out. Defendant Stuckey searched the backpack, and saw the Amazon vest. Stuckey also searched the Lexus's center console, where he found the phone that Mr. Ward had used to test T-Mobile's new 5g network.

58. Defendant Stuckey seized Mr. Ward's firearm as "evidence" and took it into custody.

59. The Defendants disregarded the fact that the T-Mobile backpack, Amazon vest, and test phone all corroborated Mr. Ward's account.

60. Defendants ran a criminal background check on Mr. Ward, which showed no prior arrest history. Defendants disregarded the fact that Mr. Ward's lack of arrest history was not consistent with the suspects they were attempting to pursue from the Days Inn.

61. Defendant Reynolds drove Mr. Ward to the Davidson County jail.

62. The Defendants left Mr. Ward's car at R & B Liquors.

63. Defendant Reynolds filed a criminal charge against Mr. Ward for Felony Evading Arrest with a Motor Vehicle, claiming under oath that Mr. Ward had failed to comply with a traffic stop on I-65 North near Dickerson Pike.

### E. Mr. Ward Fights the Criminal Charge to a Dismissal

64. The criminal charge filed by Defendant Reynolds caused Mr. Ward to be incarcerated in jail for a few hours until he made bond.

65. After getting out of jail, Mr. Ward hired Attorney Joy Kimbrough to represent him against the false charges and fought the case.

66. On June 9, 2020, the Davidson County General Sessions Court dismissed the criminal charges against Mr. Ward.

67. Mr. Ward contacted MNPD several times to request the return of his firearm. However, MNPD did not allow Mr. Ward to recover his firearm until October 20, 2020.

68. Since November 14, 2019, Mr. Ward has suffered physical injuries, ongoing sleeplessness, and ongoing anxiety as a result of Defendants' actions.

**F. Metro's Policies, Training, and Practices Caused Defendants Reynolds and Stuckey to Disregard the Exculpatory Evidence Mr. Ward attempted to Present**

69. Defendant Metro exercises control over the policies, training, and practices of MNPD.

70. MNPD's policies governing MNPD officers are codified in a 1,236 page "manual."

71. In all of its 1,236 pages, the MNPD manual uses the word "exculpatory" exactly once. This usage is in connection with MNPD's internal disciplinary procedures for dealing with allegations of officer misconduct, and has nothing to do with the policies governing arrests or the filing of criminal charges against suspects.

72. MNPD's manual does not define the constitutional requirements for an officer to arrest a suspect, i.e. "probable cause," at even a general level – much less mandate that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

73. MNPD's manual does not define the constitutional requirement for an officer to file criminal charges against a suspect, i.e. "probable cause," at even a general level – much less mandate that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

74. While MNPD's officer training programs do define the probable cause requirement for an arrest at a general level, they do not teach the constitutional requirement that officers not

"turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

75. MNPD's officer training programs do not define the constitutional requirement for filing criminal charges against a suspect, i.e. probable cause, at even a general level – much less train officers that they must not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

76. MNPD's policy and practice with regard to citizen complaints alleging that the citizen was wrongfully charged with a crime by an MNPD officer are that the complaining citizen should take those complaints to court, not MNPD.

77. While MNPD policy and practice is to conduct an investigation when a citizen whose charges have already been dismissed by a court complains to MNPD that the officer should not have filed the charges in the first place, MNPD's *de facto* practice is to not sustain disciplinary charges against the officer who filed the charges unless objective evidence, such as an audiovisual recording, proves with absolute certainty that the officer made false allegations knowing that the citizen was innocent. Functionally, the result of this impossibly high standard of proof is that MNPD virtually never sustains citizen complaints that they were wrongfully charged by MNPD officers.

78. MNPD permits its staff to maintain a professional culture that is cynical of suspects' protestations of innocence, believing that suspects should take their protests to court and that charging officer(s) need not give suspects the opportunity to exculpate themselves.

79. In totality, MNPD's policies, lack of training, lack of discipline, and tolerance of a culture of cynicism toward suspects amounts to a *de facto* policy of disregard for the

requirement that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

80. It is obvious that MNPD's *de facto* policy of disregard for the requirement that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone" will and does result in MNPD officers filing criminal charges against some citizens who could have negated probable cause if given the chance.

## CLAIMS FOR RELIEF

### COUNT I: FALSE ARREST IN VIOLATION OF THE FOURTH AMENDMENT (42 U.S.C § 1983)

#### (DEFENDANTS REYNOLDS AND STUCKEY)

81. Plaintiff hereby reincorporates paragraphs 1 – 80 by reference.

82. On November 14, 2019, Defendants Reynolds and Stuckey arrested Plaintiff.

83. The Defendants acted under color of law while arresting Plaintiff.

84. The Defendants did not have probable cause to arrest Plaintiff.

85. The Defendants acted with reckless and intentional disregard for Mr. Ward's rights.

86. The false arrest inflicted a deprivation of liberty, physical injuries, emotional injuries, and financial losses on Plaintiff.

### COUNT II: EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT (42 U.S.C § 1983)

#### (DEFENDANTS REYNOLDS AND STUCKEY)

87. Plaintiff hereby reincorporates paragraphs 1 – 80 by reference.

88. On November 14, 2019, the Defendants pointed their firearms at Plaintiff and yelled at him while ordering him to submit to their unlawful arrest.

89. The Defendants did not have a reasonable basis to justify the force they used to effect the false arrest of Plaintiff.

90. The Defendants acted under color of law during the incident.

91. The Defendants acted with reckless and intentional disregard for Plaintiff's rights.

92. The Defendants' excessive force inflicted physical injuries, emotional injuries and resulting medical expenses on Plaintiff.

### COUNT III: MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS (42 U.S.C § 1983)

### (ALL DEFENDANTS)

93. Plaintiff hereby reincorporates paragraphs 1 – 80 by reference.

94. Defendants Reynolds and Stuckey participated in making the decision to file a false criminal charge against Plaintiff for the Tennessee offense of *Evading Arrest with a Motor Vehicle*, a Class E felony offense.

95. Defendants did not have probable cause to support the criminal charge.

96. Defendants' false criminal charge resulted in Plaintiff's continued detention.

97. Defendants' false criminal charge was ultimately dismissed.

98. Defendant Metro's policies, training, and practices caused Defendants Reynolds and Stuckey to disregard the exculpatory evidence that Mr. Ward attempted to present to them that would have negated any basis for probable cause.

99. Defendants Reynolds and Stuckey acted with reckless and intentional disregard for Plaintiff's rights.

100. The false criminal charge inflicted a deprivation of liberty, emotional pain, and financial losses on Plaintiff.

## REQUEST FOR RELIEF

**WHEREFORE**, these premises considered, Plaintiff prays:

1. That the Defendants Answer this Complaint within the time provided by law.

2. That this cause be tried by a jury.

3. That judgment for Plaintiff enter against the Defendants on each count.

4. That Plaintiff be awarded nominal damages on all counts.

5. That Plaintiff be awarded compensatory damages in an amount determined by the jury.

6. That Plaintiff be awarded punitive damages in an amount determined by the jury.

7. That Plaintiff be awarded his attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

8. That the court costs in this matter be taxed to Defendants.

9. That Plaintiff be awarded pre- and post-judgment interest against Defendants.

10. That Plaintiff be awarded all other relief to which it may appear he is entitled in the interests of justice.

Respectfully submitted,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
414 Union Street, Suite 900
Nashville, TN 37219
T: (615) 982-8002 / F: (615) 229-6387
E: kyle@mothersheadlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on **March 26, 2021**, Plaintiff's **First Amended Complaint** was filed electronically with the Court's electronic filing system. Notice of this filing will be electronically served by operation of the Court's electronic filing system on **Allison Bussell, Mallory Ricci, and Melissa Roberge, Counsels for Defendants**, at Allison.Bussell@nashville.gov, Mallory.Ricci@nashville.gov, and Melissa.Roberge@nashville.gov.


*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953