IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

RALPH WARD,                          )
                                     )
        Plaintiff,                   )
                                     )        NO. 3:20-cv-00981
v.                                   )        JUDGE RICHARDSON
                                     )
KEVIN REYNOLDS, et al.,              )
                                     )
        Defendants.                  )

## MEMORANDUM OPINION

Pending before the Court is Defendant Metropolitan Government of Nashville and Davidson County's ("Defendant Metro") Motion to Dismiss (Doc. No. 26, "Motion"). Plaintiff has filed a Response (Doc. No. 30). Defendant has filed a Reply (Doc. No. 33). After briefing of the Motion was complete, Plaintiff filed a Motion to Amend the Amended Complaint as Alternative Relief to granting the Motion. (Doc. No. 34, "Motion to Amend"). Defendants responded in opposition to the Motion to Amend. (Doc. No. 35). Plaintiff did not file a Reply. The Motion and the Motion to Amend are both ripe for review.

For the reasons discussed, the Court will deny Defendant's Motion and also will deny Plaintiff's Motion to Amend as moot.

## BACKGROUND[1]

Plaintiff, a forty-year-old African American male, worked for T-Mobile in a salaried position and as an Amazon delivery driver for additional income on the relevant day to this litigation. (Doc. No. 22 at ¶¶ 7, 8). In order to verify the address of his Amazon deliveries, Plaintiff

---

[1] The facts set forth herein are alleged in Plaintiff's Amended Complaint and are accepted as true for purposes of the Motion. The Amended Complaint is the operative complaint in this matter. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000).

1

used his smartphone and his car GPS unit. (*Id.* at ¶¶ 10, 11). Plaintiff drove a red hybrid Lexus. (*Id.* at ¶ 12).

On November 14, 2019, Plaintiff drove to the Amazon Station on Brick Church Pike in Nashville, Tennessee to pick up packages for an evening route, and departed the station at roughly 6:17 p.m. (*Id.* at ¶¶ 14-16). Plaintiff made deliveries in Hendersonville and Gallatin, finishing around 8:18 p.m. (*Id.* at ¶ 18). Plaintiff then began to drive back toward his home in Nashville, planning to stop by R&B Liquors on his way. (*Id.* at ¶ 19). While driving to the store, Plaintiff did not travel on I-65 North or Dickerson Pike; instead, he tookI-65 South, I-24 East, and several backroads). (*Id.* at ¶¶ 19-27).

That same evening, a Metropolitan Nashville Police Department ("MNPD") team was conducting surveillance of a suspected "dope party" at a Days Inn room. (*Id.* at ¶ 29). A black Nissan that the MNPD had been tracking earlier in the day parked at the hotel. (*Id.* at ¶ 32). A man got out of the Nissan and walked up to the hotel, and a few minutes later two men got into the Nissan and left the Days Inn. (*Id.* at ¶¶ 32-33). The MNPD team members believed that a suspect with an outstanding warrant for homicide was potentially in the Nissan and tracked the Nissan on I-65 North. (*Id.* at ¶¶ 34,35). They attempted to pull over the Nissan, but it exited onto Briley Parkway East and the MNPD officers lost track of the vehicle. (*Id.* at ¶ 35).

Other MNPD units (that operated as part of the same MNPD team as the other officers) misidentified a different car on Briley Parkway, a red Lexus (Plaintiff's car), as the target car. (*Id.* At ¶ 36). The team discussed the red Lexus over the radio, and the officer who attempted to pull over the black Nissan spoke up to state that the original target was a Nissan. (*Id.* at ¶ 37). The team disregarded this information and instead identified the red Lexus as the target vehicle to dispatch. (*Id.* at ¶ 38). The team then trailed Plaintiff's car to R&B Liquors. (*Id.* ¶ 39).

2

Upon arriving at R&B Liquors, the officers drew their guns and ran into the store. (*Id.* at ¶ 42). They shouted at Plaintiff to lay down on the floor with his hands behind his back. (*Id.* at ¶ 43). Plaintiff complied, and the officers injured his shoulder while cuffing his hands behind his back. (*Id.* at ¶¶ 45, 46). Plaintiff asked why he was being arrested, and the officers stated that he had fled a traffic stop on I-65 North, which Plaintiff denied. (*Id.* at ¶¶ 51-53). Plaintiff told the officers he had not been on I-65 North and offered to show his GPS routes for the evening, but the officers refused. (*Id.* at ¶¶ 53, 54). The officers also discussed that there had been two men in the target car, but they speculated that the other man could have run off. (*Id.* at ¶ 55). Plaintiff informed the officers that he had a firearm in his car for which he had a lawful carry permit. (*Id.* at ¶ 56). The officers searched the car, saw his work equipment, and took his firearm as "evidence." (*Id.* at ¶¶ 57, 58). The officers also ran a criminal background check on Plaintiff, and they disregarded the fact that he (unlike the suspects they believed they were pursuing) had no prior arrests. (*Id.* at ¶ 60).

Plaintiff was thereafter taken to the Davidson County Jail, and Defendant Reynolds filed a criminal charge against Plaintiff for Felony Evading Arrest with a Motor Vehicle. (*Id.* at ¶¶ 61-63). Plaintiff was subsequently incarcerated for a few hours until he made bond. (*Id.* at ¶ 64). The criminal charges were dismissed in June 2020. (*Id.* at ¶ 66). Plaintiff contacted MNPD to recover his confiscated firearm several times, but it was not recovered until October 2020. (*Id.* at ¶ 67).

In his Amended Complaint Plaintiff brings the following three counts: I) false arrest in violation of the Fourth Amendment against Defendants Reynolds and Stuckey, II) excessive force in violation of the Fourth Amendment against Defendants Reynolds and Stuckey, and III) malicious prosecution in violation of the Fourth and Fourteenth Amendments against all

Defendants. Defendant Metro is the only Defendant that has moved to dismiss the claims against it.

## LEGAL STANDARD

For purposes of a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must take all the factual allegations in the complaint as true, as it has done above. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 1950. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), cited in *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish plausibility of entitlement to relief even if it supports the possibility of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such

4

allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

5

**DISCUSSION**

Defendant Metro has moved to dismiss the claim against it (malicious prosecution) under Rule 12(b)(6), arguing that the Amended Complaint fails to state a municipal-liability claim. (Doc. No. 27 at 1).

A municipality can be liable under Section 1983 only if the plaintiff establishes that: "(1) the plaintiff's harm was caused by a constitutional violation; and (2) the [municipality] was responsible for that violation." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). Municipalities cannot be held liable under Section 1983 on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, "municipalities are liable for harms resulting from a constitutional violation only when the injury resulted from an 'implementation of [the municipality's] official policies or established customs.'" *Spears*, 589 F.3d at 256 (quoting *Monell*, 436 U.S. at 708 (Powell, J., concurring)) (emphasis in original). A claim of municipal liability requires a showing that the alleged misconduct is the result of a policy, statement, regulation, decision or custom promulgated by Defendant Metro or its agent. *Monell*, 436 U.S. at 690-91. A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following circumstances: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013).

Plaintiff here asserts only one such circumstance: a policy of inadequate training.[2]

---

[2] Plaintiff does make an oblique reference to something that perhaps was intended to implicate the fourth of these circumstances. That is, he alleges that tolerance of a "culture of cynicism toward suspects amounts to a *de facto* policy of disregard for the requirement that officers not turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone." (Doc. No. 22 at ¶ 79). But in its Memorandum in support of its Motion, Defendant argues that

6

To state a Section 1983 claim based on a failure to train, a plaintiff must plead facts sufficient to plausibly show that: "(1) the training [ ] was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) (quoting *Plinton v. Cnty. of Summit*, 450 F.3d 459, 464 (6th Cir. 2008)). We have further elaborated that, "[t]o show deliberate indifference, Plaintiff[s] must show prior instances of unconstitutional conduct demonstrating that the [city] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."

As just indicated, for a municipality to be liable under Section 1983 based on harm resulting from the failure to implement a municipal policy, the lack of a policy must amount to deliberate indifference to the injured party. *See Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 900 (6th Cir.

_____

Plaintiff did not sufficiently support, with factual matter as required by *Iqbal* and *Twombly*, any allegation of a widespread custom of tolerance or acquiescence. (Doc. No. 27 at 7). Plaintiff did not address this argument in his Response, and in its Reply Defendant Metro correctly notes that Plaintiff's Response addressed only the third circumstance. Thus, the Court concludes that Plaintiff has not adequately presented an argument for the survival of his claim against Defendant Metro based on the fourth circumstance. So the Court herein reaches, and need reach, only the third circumstance, which (as discussed below) the Court finds has been sufficiently alleged so as to mandate denial of the Motion irrespective of the first, second, and fourth circumstances.

Defendant Metro suggests that the Motion "should be granted, as unopposed on all . . . grounds" other than a policy of inadequate training (the third circumstance). (Doc. No. 33 at 1 n.1). The Court is unsure precisely what Defendant Metro is suggesting here. If it means to suggest that the Court should (even if finding that the Amended Complaint survives based on allegations of the third circumstance) grant the Motion in part—*i.e.*, grant the Motion "on all other grounds," *id.*—the Court declines to do so. The Court agrees that the Amended Complaint does not adequately support a claim against Defendant Metro based on any alleged circumstances other than a policy of inadequate training, but the Court does not believe it appropriate to parse a claim so finely as to partially "dismiss" a claim in the sense of "dismissing" it with respect to theories that could have been alleged in support of a claim but were not. In other words, on a Rule 12(b)(6) motion to dismiss, the Court determines whether to dismiss particular claims against particular defendants, and not whether to "dismiss," in effect, unpleaded theories that potentially could have been pled in support of the claim(s).

7

2004); *see also Escamilla v. Webb Cnty., Tex.*, No. 5:11-CV-13, 2015 WL 3771085, at *6 (S.D. Tex. June 17, 2015) ("For a [municipality] to be liable for failing to act affirmatively, such as a failure to train or supervise, or a failure to implement a policy, a plaintiff must show that the [municipality] was deliberately indifferent to the fact that its failure to act would likely cause violations of particular constitutional rights.") (citation omitted); *Cerbelli v. City of New York*, 600 F. Supp. 2d 405, 412 (E.D.N.Y. 2009) ("To the extent plaintiff's *Monell* claim is based on [a municipality's] alleged failure to train or supervise employees, or its failure to implement a policy or program responding to a problem adequately, plaintiff must show that the alleged failure 'amounts to deliberate indifference to the rights of persons with whom the [municipal employees] come into contact.'" (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989))). Where a complaint "is devoid of any allegations identifying the allegedly deficient policy, how existing policies and procedures are inadequate . . . or [defendant's] awareness of the deficiency in existing policy and the risk it posed[,]" the complaint fails to state a viable claim. *Dishman v. Correct Care Solutions, LLC*, No. 17-CV-98-HRW, 2018 WL 3097319, at *5 (E.D. Ky. June 22, 2018) (citing *Twombly*, 550 U.S. at 555).

The Sixth Circuit has identified two ways to demonstrate a municipality's deliberate indifference under a failure to affirmatively act (*i.e.*, train, supervise, or implement a policy) theory. First, the plaintiff may "show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training [supervision, or existing policies] in this particular area was deficient and likely to cause injury." *Plinton*, 540 F.3d at 464 (citing *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)); *see also Marcilis,* 693 F.3d at 605 (quoting *Plinton*, 450 F.3d at 464); *Breaud v. Breaud*, No. 1:15-CV-00053, 2016 WL 10650417, at *17 (M.D. Tenn. Dec. 19, 2016) ("To succeed on her claim that

8

Centerville's policies are deficient, Plaintiff must show 'actual knowledge indicating a deficiency with the existing policy . . . (or the lack thereof), such as where there have been recurring constitutional violations.'" (quoting *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012))). In the alternative, a single incident may demonstrate deliberate indifference where there is "a complete failure to train [or supervise] the police force, training [or supervision] that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result," *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 567 (6th Cir. 2011) (citing *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)), or where a violation of a federal right is a "highly predictable consequence" of a municipality's lack of a policy. *Breaud*, 2016 WL 10650147, at *17 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997); *City of Canton*, 489 U.S. at 390).[3]

The specific allegations in the Amended Complaint regarding Defendant Metro's liability are as follows:

- 69. Defendant Metro exercises control over the policies, training, and practices of MNPD.

---

[3] In *City of Canton*, the Supreme Court posed the following hypothetical that left the door open for this alternative single-incident line of cases to develop:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, *see Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights. It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.

*City of Canton*, 489 U.S. 378, 390 n.10.

- 70. MNPD's policies governing MNPD officers are codified in a 1,236 page "manual."

- 71. In all of its 1,236 pages, the MNPD manual uses the word "exculpatory" exactly once. This usage is in connection with MNPD's internal disciplinary procedures for dealing with allegations of officer misconduct, and has nothing to do with the policies governing arrests or the filing of criminal charges against suspects.

- 72. MNPD's manual does not define the constitutional requirements for an officer to arrest a suspect, *i.e.* "probable cause," at even a general level – much less mandate that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

- 73. MNPD's manual does not define the constitutional requirement for an officer to file criminal charges against a suspect, *i.e.* "probable cause," at even a general level – much less mandate that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

- 74. While MNPD's officer training programs do define the probable cause requirement for an arrest at a general level, they do not teach the constitutional requirement that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

- 75. MNPD's officer training programs do not define the constitutional requirement for filing criminal charges against a suspect, i.e. probable cause, at even a general level – much less train officers that they must not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

- 76. MNPD's policy and practice with regard to citizen complaints alleging that the citizen was wrongfully charged with a crime by an MNPD officer are that the complaining citizen should take those complaints to court, not MNPD.

- 77. While MNPD policy and practice is to conduct an investigation when a citizen whose charges have already been dismissed by a court complains to MNPD that the officer should not have filed the charges in the first place, MNPD's *de facto* practice is to not sustain disciplinary charges against the officer who filed the charges unless objective evidence, such as an audiovisual recording, proves with absolute certainty that the officer made false allegations knowing that the citizen was innocent. Functionally, the result of this impossibly high standard of proof is that MNPD virtually never

10

sustains citizen complaints that they were wrongfully charged by MNPD officers.

- 78. MNPD permits its staff to maintain a professional culture that is cynical of suspects' protestations of innocence, believing that suspects should take their protests to court and that charging officer(s) need not give suspects the opportunity to exculpate themselves.

- 79. In totality, MNPD's policies, lack of training, lack of discipline, and tolerance of a culture of cynicism toward suspects amounts to a *de facto* policy of disregard for the requirement that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone."

- 80. It is obvious that MNPD's *de facto* policy of disregard for the requirement that officers not "turn a blind eye to potentially exculpatory information known to them in an effort to pin a crime on someone" will and does result in MNPD officers filing criminal charges against some citizens who could have negated probable cause if given the chance.

(Doc. No. 22 at ¶¶ 69-80). Thus, Plaintiff alleges that Defendant Metro has a policy to inadequately train MNPS officers as to the handling of exculpatory evidence.[4]

Plaintiff does not attempt to argue that his claim survives under the first avenue discussed above, *i.e.* prior instances of unconstitutional conduct demonstrating that Defendant Metro has ignored a history of abuse. Instead, Plaintiff argues in his Response that under *Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006), he has shown a single violation of federal rights

---

[4] Notably, there are various senses in which exculpatory evidence, depending on its form (testimonial, documentary, or physical) can be "handled" (or mishandled). It can be collected (or, conversely, go uncollected). It can be properly documented (or, conversely, go undocumented). It can be disclosed to a defendant during litigation of the criminal case (or, conversely, go undisclosed or, worse, deliberately concealed). It can be subjected to analysis or testing (or, conversely, go unanalyzed and untested). It can be followed-up on (or conversely, not be subjected to follow-up). And it can be taken into consideration when making decisions such as whether to arrest or charge someone whose guilt is called into question by the exculpatory evidence (or, conversely, ignored when making such decisions). It appears that Plaintiff here is alleging that he was victimized by the last kind of mishandled, i.e.*,* that credible evidence of an obviously and very exculpatory nature was disregarded by MNPD officers when deciding to arrest and charge Plaintiff.

11

sufficient to survive a motion to dismiss. Reversing a district court's decision granting summary

judgment in favor of a defendant city, the Sixth Circuit in *Gregory* explained that:

> The courts recognize a systematic failure to train police officers adequately
> as custom or policy which can lead to city liability. *City of Canton v. Harris*, 489
> U.S. 378, 388, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989). Only when the failure to
> train amounts to "deliberate indifference" on behalf of the city toward its
> inhabitants, however, will failure to train lead to city liability under § 1983. *Id.* at
> 389. The Supreme Court explained this standard in *Harris*:
>
>> The issue . . . is whether that training program is adequate; and if it
>> is not, the question becomes whether such inadequate training can
>> justifiably be said to represent "city policy." It may seem contrary
>> to common sense to assert that a municipality will actually have a
>> policy of not taking reasonable steps to train its employees. But it
>> may happen that in light of the duties assigned to specific officers or
>> employees the need for more or different training is so obvious, and
>> the inadequacy so likely to result in the violation of constitutional
>> rights, that the policymakers of the city can reasonably be said to
>> have been deliberately indifferent to the need. In that event, the
>> failure to provide proper training may fairly be said to represent a
>> policy for which the city is responsible, and for which the city may
>> be held liable if it actually causes injury.
>
> *Id.* at 390, 109 S. Ct. 1197 (footnotes omitted).

> Plaintiff can survive summary judgment under this standard by showing that
> officer training failed to address the handling of exculpatory materials and that such
> a failure has the "highly predictable consequence" of constitutional violations of
> the sort Plaintiff suffered. *See Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir.
> 2003) (referencing *Harris*, 489 U.S. at 390, 109 S. Ct. 1197). In *Cherrington*, this
> Court held that a city's failure to train its officers on warrantless arrests was so
> likely to result in constitutional violations that the city's failure amounted to
> deliberate indifference. 344 F.3d at 646–47. Here, Plaintiff alleges that Tarter and
> Clark's failures to disclose exculpatory materials were the " 'highly predictable
> consequence[s] of a failure to equip law enforcement officers with specific tools to
> handle recurring situations.' " (Pl. Final Second Br. 67 (citing *Brown*, 520 U.S. at
> 409, 117 S. Ct. 1382.)) In their investigative capacities, police officers regularly
> uncover exculpatory materials. The Supreme Court has laid down very specific
> obligations of police officers on the disclosure of exculpatory materials. *See Brady*,
> 373 U.S. at 87, 83 S. Ct. 1194. Widespread officer ignorance on the proper handling
> of exculpatory materials would have the "highly predictable consequence" of due
> process violations. *See Cherrington*, 344 F.3d at 646. Therefore this Court looks to
> the training City police officers received in handling exculpatory materials . . .

12

At a minimum, Plaintiff has presented sufficient evidence to survive summary judgment on his failure to train allegations regarding exculpatory materials. The obligation to turn over exculpatory materials is a significant constitutional component of police duties with obvious consequences for criminal defendants. This Court has held that evidence pointing to a City's failure to provide any training on key duties with direct impact on the constitutional rights of citizens is sufficient to survive summary judgment with a *Monell* failure to train claim. *See Sell v. City of Columbus*, 47 Fed. Appx. 685, 694–95 (6th Cir. 2002) (unpublished opinion) (reversing summary judgment for defendant city when Plaintiff had presented evidence that City failed to train officers in constitutional implications of evicting without a pre-eviction hearing).

This Court finds that the district court erred when it failed to consider that evidence of failure to train on the proper handling of exculpatory materials has the "highly predictable consequence" of constitutional violations. *See Brown*, 520 U.S. at 409, 117 S. Ct. 1382. A custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the part of the City and the causal connection to the constitutional violations experienced by Plaintiff. *Id.* at 407, 117 S. Ct. 1382. Plaintiff has carried his burden for summary judgment.

*Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006); *see also Cristini v. City of Warren*, No. 07-11141, 2012 WL 5508369, at *13 (E.D. Mich. Nov. 14, 2012) ("Just as in the hypothetical advanced in *Canton*, city policymakers know to a 'moral certainty' that at some point, their investigating officers will be confronted with evidence that contradicts a working investigative theory and tends to exonerate a prime suspect. Unlike the prosecutors in *Connick*, those officers presumably are not generally familiar with *Brady*'s principles or equipped to do the necessary legal research to become familiar with those principles. Although it is true that a potential *Brady* violation lacks the split-second, life-or-death immediacy of a decision to use deadly force, it is still the case that '[t]here is no reason to assume that police academy applicants are familiar with the constitutional [disclosure requirements under *Brady*]. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require.' *Connick*, 131 S. Ct. at 1361. Further, the failure to disclose exculpatory information could have serious consequences, such as the conviction of an innocent person. It cannot be gainsaid, therefore, that 'there is an obvious need

13

for some sort of training.'" (discussing *Gregory*)); *Ricks v. Pauch*, 322 F. Supp. 3d 813, 830 (E.D. Mich. 2018) (citing *Cristini* and not dismissing *Brady*-derived *Monell* claim); *Crews v. Cty. of Nassau*, 996 F. Supp. 2d 186, 210 (E.D.N.Y. 2014) ("Finally, if plaintiff's evidence is credited and construed most favorably to plaintiff, a reasonable jury could conclude that, because police officers do not come to their jobs trained in the law, a municipality's failure to train them on how to handle exculpatory evidence has the obvious consequence of leading to constitutional violations, such that a single incident can give rise to *Monell* liability." (citing *Gregory*)); *Prevost v. City of New York*, No. 13-CV-3760 VEC, 2014 WL 6907560, at *7 (S.D.N.Y. Dec. 9, 2014) ("[T]he City's failure to provide adequate training regarding the importance of an exculpatory defense when determining whether probable cause exists carried a 'highly predictable' consequence."); *Hinman v. Joyce*, 201 F. Supp. 3d 1283, 1299 (D. Colo. 2016) ("But if, as alleged, Denver police detectives are trained to draft probable cause statements without reference to exculpatory information (either because they are specifically instructed not to include it, or because the training consistently fails to discuss it), then Denver faces a situation in which 'the need for more or different training is so obvious' because the lack of such training is 'likely to result in the violation of constitutional rights.'"). Therefore, the Court finds that Plaintiff's allegations that Defendant Metro has failed to provide training to its officers on the handling of exculpatory evidence plausibly suggest that Defendant Metro is liable under a cognizable example of the single instance theory.

Defendant Metro makes several arguments to the contrary. In its Reply, Defendant Metro argues that *Canton* and its progeny apply only to a complete lack of training and that Defendant Metro should be dismissed from this matter because Plaintiff has alleged (*i.e.*, conceded) in his

Amended Complaint that the MNPD manual[5] provides training on the general meaning of probable cause in the context of arresting an individual.[6] (Doc. No. 33 at 2). The logic here seems to be that, because the officers concededly received some level of training on a concept (probable cause) on

---

[5] Defendant Metro does not argue that a manual is not a type of training. One might wonder whether a manual relates to *training* (and not just to *policy*), such that an omission from a manual can be considered a deficiency in training. Courts have indicated that manuals used in training can be used to show a deficiency in that training. *E.g.*, *Slone v. Lincoln Cty., Kentucky*, 242 F. Supp. 3d 579, 596 (E.D. Ky. 2017) (describing reading a manual as a type of training), *judgment entered*, No. CV 5: 15-327-DCR, 2017 WL 5653879 (E.D. Ky. Mar. 24, 2017); *Hooper v. City of Detroit*, 50 F. Supp. 2d 689, 694 (E.D. Mich. 1999) (finding no deliberate indifference when a manual addressed a particular situation).

[6] As noted above, many of the cases interpreting *City of Canton* describe it as applying only to "a *complete* failure to train." *Harvey*, 453 F. App'x at 567 (emphasis added). However, some opinions, including those by the Sixth Circuit, indicate that some level of training (instead of a "complete failure") is provided, as long as that training amounts to "*essentially* completely fail[ing] to train." *Hays*, 668 F.2d at 874 (emphasis added); *O'Connor v. Cunningham*, No. 3:13-CV-00229, 2016 WL 3523884, at *3 (M.D. Tenn. June 28, 2016) (same); *Warren v. Metro. Gov't of Nashville*, No. 3:14-CV-2373, 2015 WL 3417844, at *5 (M.D. Tenn. May 27, 2015) (same); *see also Brown v. Chapman*, No. 15-3506, 2016 WL 683260, *12 (6th Cir. Feb. 19, 2016) (finding outdated training materials to constitute inadequate training); *Williams v. Peltier*, No. 3:16-CV-01654, 2020 WL 1820105, at *2 (M.D. Tenn. Apr. 10, 2020) (declining to dismiss complaint alleging unconstitutional use of force based on single instance theory even though complaint acknowledged that some limited training regarding use of force was provided to reserve deputies). Both lines of cases often cite to the *Hays* case, which explained the standard as such:

> Where, as here, the constitutional violation was not alleged to be part of a pattern of past misconduct, a supervisory official or a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable, *e.g.*, *Leite v. City of Providence*, 463 F. Supp. at 590, or would properly be characterized as substantially certain to result, *Rheuark v. Shaw*, 477 F. Supp. 897 (N.D. Texas 1979).

668 F.2d at 874. The Court need not decide whether it is enough to allege "essentially a complete failure to train" or "reckless or grossly negligent" training, because the Court finds that Plaintiff has sufficiently alleged a *complete* lack of training regarding the proper handling of exculpatory evidence. Plaintiff is alleging not that the officer's training on the proper handling of exculpatory evidence was inadequate or poor, but rather that the officers received *no training at all* on how to handle exculpatory evidence.

which exculpatory evidence could bear in a particular case, Defendant Metro concededly did not completely fail to provide training as to exculpatory evidence. However, the Court is unpersuaded by this argument. By conceding that there was some training as to probable cause, Plaintiff does not concede there was some training on exculpatory evidence.[7]

Probable cause is a concept that *can* (not to say *must* or even *should*) be considered (and likewise discussed) without reference to the existence of exculpatory evidence; for example, a federal grand jury can return a true bill in the event it finds probable cause, and yet there is no requirement that the grand jury be presented with available exculpatory evidence before making its probable cause determination. *See United States v. Williams,* 504 U.S. 36, 55 (1992) (holding that there is no "require[ement] for [a federal] prosecutor to disclose exculpatory evidence to the grand jury").[8] So to say that MNPD provided training as to probable cause (in the context of arrests) is not to say that MNPD provided training as to the handling of exculpatory evidence, and

---

[7] Moreover, Plaintiff did not concede that there was any training as to probable cause within the context of *filing criminal charges* (as opposed to the context of arrests), and Count III (alleging malicious prosecution in violation of the First and Fourteenth Amendments) is concerned specifically with the lack of probable cause to support the filing of charges against Plaintiff. So even if training as to probable cause necessarily did encompass training as to exculpatory evidence (which it does not), Plaintiff did not concede that Defendant Metro provided some training as to exculpatory evidence in the relevant context of the decision whether to file criminal charges.

[8] The Court is aware that the Tennessee rule may be different, and that exculpatory evidence may need to be provided to a grand jury prior to its deliberations, and indeed to a defendant even prior to the preliminary hearing. *State v. Allen*, No. M201900667CCAR3CD, 2020 WL 7252538, at *21 (Tenn. Crim. App. Dec. 10, 2020) (holding that "[t]he State's failure to furnish obviously exculpatory information before the preliminary hearing, coupled with the death of . . . the State's key witness, before Defendant had an opportunity to cross-examine . . . violated Defendant's right to a fair trial."). But that is not to say that probable cause must be considered in light of any exculpatory evidence (which potentially could detract from the probable cause otherwise existing) prior to an *arrest* or *filing of a charge*; so it is not to say that the consideration of exculpatory evidence is necessarily built into consideration of whether probable cause supports an arrest or the filing of a charge. And more to the point, it is not to say that probable cause cannot be conceptualized—and discussed in training or a manual—without reference to exculpatory evidence.

16

the Amended Complaint alleges (and its allegations are what matter at this juncture) that indeed there was no training *specifically* as to the handling of exculpatory evidence. This is sufficient for Count III to survive, despite the conceded existence of some training as to probable cause. *See Hinman*, 201 F. Supp. 3d at 1299 (holding that although the defendant officer concededly had received some level of training on probable cause and drafting probable cause statements, the plaintiff's claim against the defendant municipality survived a Rule 12(b)(6) motion based on allegations that it trained officers to draft probable cause statements without reference to exculpatory information). In summary, the existence of training (or, for that matter, a policy) covering a broad topic does not necessarily doom a claim based on the municipality's (supposedly deliberate) lack of training on a more specific sub-topic. *See e.g.*, *Thompson v. City of Lebanon*, No. 3:11-CV-00392, 2014 WL 12677063, at \*3 (M.D. Tenn. June 10, 2014) (denying summary judgment in single instance-theory case brought by the estate of an individual shot after a car chase because although a general use-of-force policy was in place, the policy did not specifically address procedures to follow when using a firearm after a vehicle chase), *aff'd sub nom. Thompson v. City of Lebanon, Tennessee*, 831 F.3d 366 (6th Cir. 2016).

Defendant Metro also relies on the principle that "'a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.'" (Doc. No. 27 at 6 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). But *Connick* itself was decided in the summary-judgment context, and thus cannot be taken to mean that a claim premised on an alleged policy to fail to train is always, or even typically, too tenuous to survive a Rule 12(b)(6) motion.[9] Defendant Metro likewise relies on the statement in the plurality opinion in *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), that a policy of inadequate training is "far more nebulous, and

---

[9] To its credit, Defendant Metro does not specifically argue otherwise.

17

a good deal further removed from the constitutional violation, than was the policy in *Monell*." *Id.* at 822-23. This statement, though true as far as it goes, does not mean that these "more nebulous" policies cannot support a claim of municipal liability; under certain circumstances, they can, as discussed above.[10] And to the extent that a claim based on a policy of inadequate training could fail on the grounds that the policy *proves* to be nebulous, that does not mean that the claim should be nipped in the bud at the pleading stage under the *assumption* that the policy is nebulous. *Tuttle* was decided after a jury trial, by which time the evidence would have illuminated exactly what (if anything) the alleged policy was and the extent to which it was indeed nebulous. At the pleading stage, it is far from clear just how "nebulous" the alleged policy was; conceivably, discovery could reveal that the (alleged) policy in this case was relatively express and defined a typical policy of inadequate training, which might be expected to be entirely tacit and unverbalized.

Defendant Metro also invokes *Johnson v. Metropolitan Government*, No. 3:10-cv-0589, 2010 WL 3619790 (M.D. Tenn. Sept. 13, 2010), in which a claim of municipal liability was made against Defendant Metro based on its hiring of co-defendants responsible for the fatal shooting of the plaintiff's decedent. However, this opinion, in addition to be non-binding, is inapplicable in the present case in that the plaintiff there did not assert a single-instance theory of liability.

Additionally, Defendant also argues that Plaintiff has not alleged a causal causation between the alleged policy of inadequate training and the alleged unconstitutional arrest and charge to which he was subjected. (Doc. No. 27 at 6-7). The Court disagrees.

Regarding causation, Plaintiff alleges that Defendant Metro's alleged policy of disregarding an asserted requirement that officers not ignore exculpatory evidence "result[s] in MNPD officers filing criminal charges against some citizens who could have negated probable

---

[10] Again to its credit, Defendant Metro does not specifically argue otherwise.

cause if given the chance." (Doc. No. at ¶ 80). Plaintiff further alleges that this is what happened in his own case. (*Id.* at ¶ 98). He thus has alleged, even if not with laser clarity, that he was injured by an unconstitutional criminal charge that resulted from Defendant Metro's alleged policy of inadequate training as to exculpatory evidence. The Sixth Circuit has found that a failure to train on the proper use of exculpatory evidence is, for purposes of surviving a summary judgment motion, both "sufficient to establish the requisite fault on the part of the City and the causal connection to the constitutional violations experienced by Plaintiff." *Gregory*, 444 F.3d at 753. At the summary-judgment stage, a plaintiff can survive "by showing that officer training failed to address the handling of exculpatory materials and that such a failure has the highly predictable consequence of constitutional violations of the sort [the p]laintiff suffered." *Id.* So it follows that at the motion-to-dismiss stage, a plaintiff can survive by *adequately alleging* that officer training failed to address the handling of exculpatory materials and that such a failure has the highly predictable consequence of constitutional violations of the sort the plaintiff suffered. As discussed, Plaintiff has adequately alleged this failure and that it has the consequence—which the Amended Complaint strongly implies is "highly predictable indeed"—of unconstitutional criminal charges of the sort Plaintiff contends he suffered.

So Defendant Metro here is ultimately relegated to the argument that Plaintiff's allegation about these predictable consequences is entirely conclusory and not supported by adequate factual matter. It is true that Plaintiff's allegation of causation is not supported by much factual matter. But in the Court's view, the Sixth Circuit is far more accepting of conclusory allegations regarding a connection between wrongdoing and harm to the plaintiff than of conclusory allegations regarding the wrongdoing itself. *See Ladd v. Nashville Booting, LLC*, No. 3:20-CV-00626, 2021 WL 3363448, at *12 (M.D. Tenn. Aug. 3, 2021) (opining that *Marais v. Chase Home Finance*

19

*LLC*, 736 F.3d 711 (6th Cir. 2013), suggests that the Sixth Circuit, due to the requirement to draw inferences from the alleged facts in the plaintiff's favor, is inclined to reject defendants' claims of an insufficiently alleged link between the defendant's alleged violation of law and the alleged harm to the plaintiff). Perhaps this is because the existence of such a link is typically inferred from the facts regarding the defendant's violation and the plaintiff's harm, rather than demonstrated by separate (additional) facts showing the link. The Court concludes that where, as here, the causal link is both plausible and inferable from the alleged factual matter regarding the defendant's violation and the plaintiff's harm, a seemingly conclusory allegation of such causation—being *inferable* rather than merely conclusory—is sufficient. The alleged causal connection between Defendant Metro's alleged policy and the officers' alleged actions may or may not ultimately be borne out by the evidence; a jury may or may not infer or otherwise find the existence of such link. But it is sufficiently alleged.

The merits of Defendant Metro's position, based on the evidence and on the contours of the First and Fourteenth Amendment in the particular context at issue in this case,[11] remain to be seen. But the Court finds that Plaintiff has plausibly stated a claim to relief on a single-instance theory of liability due to an alleged policy of failing to train officers on the proper handling of exculpatory evidence. The Court thus rejects Defendant Metro's Motion. Since the Amended

---

[11] Defendant Metro asserted that the constitutional violation alleged in Count III could only have been a violation of the Fourth Amendment (as incorporated into the Fourteenth Amendment), and not of Fourteenth Amendment substantive due process. (Doc. No. 27 at 2 n.2). Otherwise, the contours of the rights invoked in Count III were not really addressed in the briefing on the instant Motion, and the Court herein expresses no views on them.

20

Complaint survives the Motion without Plaintiff's proposed change to the Amended Complaint,[12] the Court will deny the Motion to Amend as moot.

## CONCLUSION

For the reasons discussed, the Court will deny Defendant's Motion (Doc. No. 26). The Court will deny Plaintiff's Motion to Amend (Doc. No. 34) as moot.

An appropriate order will be entered.

*Eli Richardson*
_____
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[12] In the Motion to Amend, Plaintiff proposes making one change to the Amended Complaint. Plaintiff wishes to substitute for the current paragraph 74 the following paragraph:

- MNPD's officer training programs define the probable cause requirement required to justify an arrest at only a vague, general level, without any explanation of the officer's duty to inspect and consider potentially exculpatory evidence or statements brought to his attention during the course of the investigation. Specifically, MNPD's training on probable cause to arrest states only that "Probable Cause to Arrest" is defined as "a reasonable ground of suspicion, *supported by circumstances sufficiently* strong in themselves to *warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.*" (emphasis in original).

(Doc. No. 34 at 3).